**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          sbogdanovich@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| MICHAEL WALSH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CALIFORNIA CINEMA INVESTMENTS LLC and USA CINEMA INVESTMENTS HOLDING INC., d.b.a. CINÉPOLIS LUXURY CINEMAS and CINÉPOLIS USA,<br><br>Defendants. | Case No.   2:23-cv-9608<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Michael Walsh ("Plaintiff"), individually and on behalf of all other persons similarly situated ("Class members"), by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Defendant, USA Cinema Investments Holding Inc. ("USA Cinema"), is a cinema chain with movie theaters across the United States. USA Cinema offers the website, cinepolisusa.com, where consumers can purchase movie tickets online.[1] Cinepolisusa.com is operated by Defendant, California Cinema Investments LLC ("CCI"). USA Cinema and CCI are collectively referred to as the ("Defendants"). Defendants have installed "tracking pixels" on cinepolisusa.com. These tracking pixels secretly and surreptitiously send consumers' personally identifiable information ("PII"), personal information, and/or the contents of video rental records to Meta Platforms, Inc. ("Meta" or "Facebook") every time consumers purchase a movie ticket on Defendants' website. Defendants' disclosure of consumers' PII is done without consumer consent in violation of the Video Privacy Protection Act ("VPPA") and California Civil Code § 1799.3.

2. Through the tracking pixels that Defendants have installed on cinepolisusa.com, Meta obtains the titles of the movies consumers purchased tickets to see. These tracking pixels include unique user ID numbers which Meta uses to identify particular individuals and link them to their movie metadata. All this is done to build digital dossiers on people and retarget them for advertising with alarming accuracy. Because Defendants disclose all this and other sensitive data about consumers that they collect on cinepolisusa.com without those consumers' written

---

[1] CINÉPOLIS, https://www.cinepolisusa.com/.

consent, Defendants violated the Video Privacy Protection Act ("VPPA") and California Civil Code § 1799.3.

3.    As Congress has recognized, "films are the intellectual vitamins that fuel the growth of individual thought." S. Rep. No. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. at 10 (Aug. 3, 1988)).  Indeed, the videos people watch can often reveal their private politics, religious views, or sexuality – in other words, their most personal and intimate details.  *Id.*  In enacting the VPPA, Congress decided that this intimate information "should be protected from the disruptive intrusion of a roving eye."  *Id.*

4.    The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

5.    Similarly, the State of California has given consumers even broader privacy protection through Cal. Civ. Code § 1799.3 which not only forbids disclosure of personal information, but also of "any record, including sales or rental information."

## PARTIES

6.    Plaintiff Michael Walsh is, and has been at all relevant times, a citizen of California who resides in Whittier, California.  Mr. Walsh visited the Defendants' website on his web browser to purchase movie tickets and was logged into his facebook.com account on that same web browser.

7.    Defendant USA Cinema Investments Holding Inc.  ("USA Cinema") is a Delaware corporation with its principal place of business in Dallas, Texas.

8.    Defendant California Cinema Investments LLC ("CCI")[2] is a Delaware limited liability company with its principal place of business in Dallas, Texas.

9.    USA Cinema and CCI have created a principal-agent relationship in which USA Cinema is the principal and CCI is its agent.  An "actual agency" relationship was created between Defendants due to their agreement in which CCI operates cinepolisusa.com for USA Cinema, therefore making CCI "really employed" by USA Cinema.  *See* Cal. Civ. Code § 2299 (defining an "actual agency").  Through CCI's operation of cinepolisusa.com, CCI functions as an agent because it represents USA Cinema in dealings (ticket purchasing transactions) with third parties (the consumers).  *See* Cal. Civ. Code § 2295.

10.    USA Cinema has intentionally conferred upon CCI the "actual authority" to operate its website, cinepolisusa.com, which includes the actual authority to effectuate movie ticket sales through the website.[3]  *See* Cal. Civ. Code § 2316.0.

11.    Therefore, since Defendants have an existing agency relationship and CCI has acted pursuant to its actual authority given to it by USA Cinema when operating cinepolisusa.com – including when effectuating movie ticket sales – USA Cinema, as the principal, has accrued all liabilities stemming from CCI's transactions with consumers via cinepolisusa.com.  *See* Cal. Civ. Code § 2330.

12.    Defendants' ticket-purchasing platform is used throughout California and the United States.  USA Cinema also has theaters in California and throughout the United States.

---

[2] The Privacy Policy on cinepolisusa.com lists the name of the entity that operates the website as "California Cinema Investments, Inc."  The California Secretary of State's business search tool lists that California Cinema Investments Inc. has been terminated.  It also does not appear on the Delaware Secretary of State's business search tool.  Instead, the entity, California Cinema Investments, LLC appears as an active business entity.

[3] *See* CINÉPOLIS, Privacy Policy, https://www.cinepolisusa.com/privacy-policy/#:~:text=and%20its%20affiliates%20and%20subsidiaries,dedicated%20to%20your%20online%20privacy (stating that "California Cinema Investments Inc. operates this website/site (https://www.cinepolisusa.com)").

**JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (*i.e.*, the VPPA). And this Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the United States Class and the California Class, and there is minimal diversity.

14.     This Court has personal jurisdiction over Defendants because they conduct substantial business within California, including the sale, marketing, and advertising of USA Cinema.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

**FACTUAL BACKGROUND**

**A.     The VPPA**

16.     The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the

people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

17.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

18.    As Senator Patrick Leahy explained, the VPPA was particularly concerned with consumers' video transactional data being shared with unauthorized third parties:

> The trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance.  These 'information pools' create privacy interests that directly affect the ability of people to express their opinions, to join in association with others and to enjoy the freedom and independence that the Constitution was established to safeguard.  The bill prohibits video stores from disclosing "personally identifiable information" – information that links the customer or patron to particular materials or services. In the event of an unauthorized disclosure, an individual may bring a civil action for damages.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

19.    The Senate Report for the bill further clarifies "that personally identifiable information is intended to be transaction-oriented.  It is information that

identifies a particular person as having engaged in a specific transaction with a video tape service provider."  S. Rep. 100-599, at 12.

**B.     California Civil Code § 1799.3**

20.     Cal. Civ. Code § 1799.3 provides a wider breadth of protection for consumers by requiring that:

> No person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual.

21.     Cal. Civ. Code § 1799.3 does not require that the information being disclosed by video recording sales or rental service providers be *identifiable* to any one particular person.  Instead, the statute forbids the disclosure of generalized "personal information" without that person's consent, even if that information does not serve to identify them.  The statute also forbids the disclosure of "the contents of any record, including sales or rental information," such as the mere title of the movie ticket purchased.  We know the statute *independently* forbids the "contents of any record," from being disclosed without consent because the phrase is preceded by the word, "or" – not "and."  Under California law, "the plain and ordinary meaning of the word 'or,' when used in a statute, is to designate separate, disjunctive categories.  The word 'or' suggests alternatives.  In its ordinary sense in a statute, the function of the word 'or' is to mark an alternative such as 'either this or that.'"  *In re E.A.*, 24 Cal. App. 5th 648, 661 (2018) (citations omitted) (internal quotation marks omitted).

**C.     The Meta Tracking Pixel**

22.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[4]  Facebook describes itself as a "real identity

---

[4] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html.

platform,"[5] meaning users are allowed only one account and must share "the name they go by in everyday life."[6]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[7]

23.    Meta owns facebook.com and generates revenue by selling advertising space on this website, and other applications it owns, like Instagram.[8]

24.    Meta sells advertising space by highlighting its ability to target users.[9] Meta can target users so effectively because it surveils user activity both on and ***off its site***.[10]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[11]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[12]

25.    Advertisers can also build "Custom Audiences."[13]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or

---

[5] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[6] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[7] FACEBOOK, SIGN UP, https://www.facebook.com/.

[8] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[9] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[10] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[11] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[12] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[13] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

---

visited [their] website."[14]  Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[15]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[16]  One such Business Tool is the Meta Tracking Pixel.

26.     The Meta Tracking Pixel is a piece of code that advertisers, like Defendants, can integrate into their website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[17]  When the Meta Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

27.     Advertisers control what actions – or as Meta calls it, "events" – the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[18]  Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers

---

[14] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[15] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[16] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[17] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[18] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

---

can choose, including what content a visitor views or purchases.[19]  An advertiser can also create their own tracking parameters by building a "custom event."[20]

28.    Advertisers control how the Facebook Tracking Pixel identifies visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[21]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[22] Pixel-specific Data includes "the Pixel ID and cookie."[23]

### D.    Defendants and the Meta Pixel

29.    Defendant USA Cinema is a cinema chain that offers a website – operated by CCI – where consumers can purchase movie tickets to view films at USA Cinema's theater locations.

30.    Defendants installed the Meta Tracking Pixel to track consumers' every move while on Defendants' website.  In fact, it tracks no fewer than three different events: "PageView," "Purchase," and "Button Click Automatically Detected."

31.    On cinepolisusa.com, a consumer will first choose a movie they would like to purchase tickets for.  Once the consumer enters the screen to select the date and time for the movie tickets, the Meta Tracking Pixel captures at least one event, PageView.  This PageView event contains various types of metadata that tell Meta exactly which movie a consumer is purchasing tickets for.  For example, in Figures 1 and 2, the PageView event metadata shared that the name of the movie the consumer was purchasing tickets for was *Taylor Swift: The Eras Tour*.  *See* Figures 1, 2.

---

[19] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[20] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[21] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[22] *Id.*

[23] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    9

**Figure 1**



**Figure 2**



32.    After the consumer chooses the date and time for the movie tickets, the website takes the consumer to a screen asking them to either register for a Rewards account or continue as a guest.  *See* Figure 3.  Once the consumer chooses to proceed purchasing the tickets as a guest by clicking on the "CONTINUE AS GUEST" button on the screen, they are directed to a new screen from which they choose their seats.  *See* Figure 4.  After choosing their seats and clicking the button "CONTINUE TO TICKETS," at least two Meta Tracking Pixel events are captured on this page: PageView, along with Button Click Automatically Detected.  The Meta Tracking Pixel transmits the Button Click event to Meta along with various metadata that tells Meta the consumer is at the tickets stage of the booking process and that they clicked on the "CONTINUE TO TICKETS" button on the screen.  *See* Figure 5.

**Figure 3**



**Figure 4**



**Figure 5**

33.    After clicking the "CONTINUE TO TICKETS" button, the consumer is taken to a screen to verify their movie ticket selection. *See* Figure 6.  When the consumer clicks on the "CONTINUE TO PAYMENT" button at the bottom of the screen, two more meta pixel events are generated, PageView with Button Click

Automatically Detected. *See* Figure 7. The metadata for these events tells Meta that the consumer is at the payment stage of the booking process and that the consumer pressed on the "CONTINUE TO PAYMENT" button. *See id*.

**Figure 6**



**Figure 7**



34. After the consumer continues to the payment screen and enters their payment information, the Meta Pixel Tracker generates three events: PageView, Purchase, and Button Click Automatically Detected. The metadata for the PageView

event tells Meta that the consumer is at the order confirmation stage of the booking process. *See* Figure 8. The metadata for the Purchase event tells Meta the currency in which the consumer purchased the movie tickets and the exact amount the consumer paid for the tickets. *See id.*

**Figure 8**



35. When a visitor purchases movie tickets on Defendants' website while logged into Facebook, Defendants compel a visitor's browser to transmit an identifying "computer cookie" to Facebook called "c_user." The c_user cookie contains that visitor's unencrypted Facebook ID. Figures 9 through 11 on the next page show a copy of the c_user cookie being transmitted to facebook.com, as shown on the webpage by accessing developer tools by clicking the F12 button on a keyboard.

**Figure 9**



**Figure 10**

**Figure 11**

36.    The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID.  A Facebook ID allows *anybody* – not just Facebook – to identify the individual consumer.  Specifically, if one types www.facebook.com/[FacebookID] into a web browser, it will load that individual's Facebook page.  For example, the c_user cookie in Figures 9-11 above is 1528550551, and www.facebook.com/1528550551 leads to the undersigned's Facebook page.

37.    The Meta Tracking Pixel transmits additional cookies to Meta.

38.    The "fr" cookie contains, at least, an encrypted Facebook ID and browser identifier.[24]  Facebook, at a minimum, uses the fr cookie to identify particular users.[25]

39.    Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted advertising.

40.    The Meta Tracking Pixel uses both first and third-party cookies.  A first-party cookie is "created by the website the user is visiting" – *i.e.*, Defendants.[26] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting" – *i.e.*, Facebook.[27]

41.    Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

---

[24] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[25] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[26] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[27] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

42.     A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile – and all personal information publicly listed on that profile – by appending the Facebook ID to the end of https://facebook.com/.

43.     Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, that a given consumer purchased a ticket to a particular movie from Defendants.[28]

44.     Defendants begin to collect this information through tracking pixels when a user first chooses a movie to purchase tickets for on cinepolisusa.com.

45.     Defendants disclose these identifiers so Meta can match them with a corresponding Facebook profile and link it to a consumer's subsequent activity on Defendants' website.

46.     By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data, Defendants knowingly disclose information sufficiently permitting an ordinary person to identify a specific individual's movie-viewing behavior.

47.     Meta confirms that it matches activity on cinepolisusa.com with a user's profile.  Meta allows users to download its "off-site activity," which is a "summary of activity that businesses and organizations share with [it] about [consumers'] interactions, such as visiting [organizations'] apps or websites."[29]  The off-site activity report confirms that Defendants identify an individual's movie-viewing activities.

---

[28] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

[29] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627.  As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity."  What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."

**Figure 12**



### E.    Cinepolisusa.com and Google Analytics

48.    Besides installing the Meta Tracking Pixel, Defendant also installed the Google Analytics to track consumers' every move while on Defendants' website.

49.    Like the Meta Tracking Pixel, when a consumer completes the payment for movie tickets on Defendants' website, Google Analytics captures the title of the film, along with the ticket price ($19.89), the quantity (1), type of ticket purchased (adult), the theatre location (Pico Rivera), and the total price paid with tax ($21.99). *See* Figures 13 and 14.[30]

---

[30] Figures 13 and 14 were collected from purchasing film tickets for a different time at a different theatre location than Figures 2-11.

**Figure 13**



**Figure 14**

### F.    Defendants Fail to Obtain Consent And Ignore Consumers' Privacy Choices

50.    While Defendants have been disclosing consumers' PII to Meta, they have not properly obtained consumer consent as required under the VPPA and Cal. Civ. Code § 1799.3.

51.    The VPPA only allows a video tape service provider to disclose PII of a consumer to a third party "with the informed, written consent (including through an electronic means using the Internet) of the consumer that – (i) is in a form distinct and separate from any form setting forth other legal or financial obligations to the consumer." 18 U.S.C. § 2710(B)(i).  The video tape service provider must also "provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(B)(iii).

52.     Under Cal. Civ. Code § 1799.3, a person providing video recording sales or rental services must obtain written consent of the individual whose personal information or records of sales or rental information is being disclosed.

53.     Defendants failed to meet the consent requirements under both VPPA and Cal. Civ. Code § 1799.3 because at no point did Defendants obtain informed, written consent, in a separate and distinct form (as required by VPPA), or simply written consent (as required by Cal. Civ. Code § 1799.3) from consumers.

54.     Instead, Defendants make *it seem as though* they request consent from consumers on cinepolisusa.com through a distinct form (as required by VPPA) by including a pop-up privacy tab at the bottom of the website screen titled "Your Privacy." *See* Figure 15.

**Figure 15**



55.     The privacy tab gives consumers the illusion that they have an option to opt out of Defendants sharing their PII since the tab has a button that says, "Do not Share or Sell my Personal Information." *See id.* But this is all for show, and

*cinepolisusa.com continues to collect and share the exact same information to Facebook.com even after consumers affirmatively opt out of data sharing*.

56.    Once a consumer clicks on the "Do not Share or Sell My Personal Information" button, another pop-up window appears where the consumer can customize the information they will allow Defendants to share.  *See* Figure 16.

**Figure 16**



57.    Even when consumers attempt to opt out of their PII being shared by clicking the options "Do not sell," "Do not share," and "Disagree," and click "Save and Close" to confirm their choices, Defendants continue using the Meta Tracking Pixel and continue sharing metadata detailing consumers' behavior to Meta.

58.    When a consumer attempts to opt-out of Defendants' PII sharing, the Meta Tracking Pixel generates a PageView event with multiple Button Click Automatically Detected events.  These events share metadata to Meta describing what type of information sharing consumers are attempting to opt-out of.  *See* Figures 17-19.



**Figure 17**



**Figure 18**



**Figure 19**



59.   However, none of these consumer privacy choices are respected by Defendants.  The Meta and Google Analytics Tracking Pixels continue to operate on the cinepolisusa.com website even after consumers opt out of every kind of

information sharing described in this privacy tab.  And the very same Meta Tracking Pixel events described in Figures 2-13, above, continue to be sent to facebook.com and google.com after consumers opt out of every kind of information sharing described in this privacy tab.

### G.    Defendants' Terms Are Inconspicuous and Misleading

60.    Defendants also do not provide reasonably conspicuous notice to consumers of their Terms & Conditions.  *See* Figure 20, below.

**Figure 20**



61.    In order for a ticket purchaser to notice that the "<u>Terms & Conditions</u>" language in Figure 20 contains a hyperlink, he or she would need to aimlessly hover their mouse over the text.  The hyperlink is not differentiated by color or font.  Even if a consumer does realize it is a hyperlink and clicks on it, a pop-up emerges which falsely implies that the Terms & Conditions only concern an outside food or drink policy and consent to receiving e-mails.  *See* Figure 21.

**Figure 21**



62.    In order for consumers to view the full "<u>Terms & Conditions</u>," they would need to hover their mouses aimlessly over the second underlined terms and conditions hyperlink in this pop-up screen.  If they click this link, they are then redirected to a new page that contains Defendants' "Terms & Conditions *And Dispute Resolution Agreement*."[31]

63.    Worse yet, Defendants rush consumers to complete their purchases. They are only allotted seven and a half minutes to select their movie, select their seats, input their card information, and complete the purchase.  The timer in Figure 20 is more conspicuous than the Terms & Conditions language and likely compels consumers to make up their minds quickly.

---

[31] *See* CINÉPOLIS, https://www.cinepolisusa.com/terms/?_gl=1*khhmho*_ga*NDA0MDM2NDc1LjE2OTgxMDk3M TQ.*_ga_Q46SLJ0S0Z*MTY5OTY0NTM1NS45LjEuMTY5OTY0Njg3OC40MS4wLjA (emphasis added).

64.    Defendant's full "Terms & Conditions *And Dispute Resolution Agreement*" contains 3048 words.  In order for a consumer to be able to complete reading this agreement within seven and a half minutes would require to read and process dense legalese at over 400 words per minute.  The average adult reader is only capable of processing 238 words per minute.[32]

**H.    Experience of Plaintiff**

65.    In or around May 2023, Plaintiff Michael Walsh purchased tickets for a movie from Defendants.  Once Plaintiff Walsh purchased the tickets, Defendants disclosed his PII to Meta.

66.    When Plaintiff Michael Walsh purchased movie tickets from Defendants, Defendants disclosed his event data, which recorded and disclosed the title of the movie he purchased tickets for.  Alongside this event data, Defendants also disclosed identifiers for Plaintiff Walsh including the c_user and fr cookies to Meta.

67.    By disclosing his event data and identifiers, Defendants disclosed Plaintiff Walsh's personally identifiable information to Meta.

68.    Plaintiff Walsh discovered that Defendants surreptitiously collected and transmitted his personally identifiable information in November 2023.

## CLASS ALLEGATIONS

69.    **United States Class Definition**: Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have Facebook accounts and purchased movie tickets on cinepolisusa.com (the "United States Class").

70.    **California Class Definition**: Plaintiff also seeks to represent a Class of similarly situated individuals defined as all Class members in the State of California

---

[32] SCHOLAR WITHIN, AVERAGE READING SPEED, https://scholarwithin.com/average-reading-speed#:~:text=read%2020%20pages.-,Adult%20Average%20Reading%20Speed,of%20300%20words%20per%20minute.

(the "California Class") who purchased movie tickets on cinepolisusa.com. Because the California Class includes individuals who do not have Facebook accounts (and thus would not be included in the United States Class), the California Class is its own separate and distinct Class and not a Subclass of the United States Class.

71.     Subject to additional information obtained through further investigation and discovery, the above-described United States Class and California Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

72.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**:  At this time, Plaintiff does not know the exact number of members of the aforementioned United States Class and California Class.  However, given the popularity of Defendants' website, the number of persons within the United States Class and California Class is believed to be so numerous that joinder of all members is impractical.

73.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**: There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the United States Class and California Class that predominate over questions that may affect individual members of the United States Class and California Class include:

(a)     whether Defendants collected Plaintiff's and the Classes' PII;

(b)     whether Defendants unlawfully disclosed and continue to disclose its users' PII in violation of the VPPA;

(c)     whether Defendants' disclosures were committed knowingly;

(d)     whether Defendants' disclosures were committed willfully;

(e)     whether Defendants disclosed Plaintiff's and the Classes' PII without consent; and

(f)     whether Defendants' conduct violates California Civil Code § 1799.3.

74.   **Typicality (Fed. R. Civ. P. 23(a)(3))**:  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the United States Class and California Class, used Defendants' website to purchase movie tickets, and had his PII collected and disclosed by Defendants without his consent.

75.   **Adequacy (Fed. R. Civ. P. 23(a)(4))**:  Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and Cal. Civ. Code § 1799.3.  Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor his counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Classes.  Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Classes, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendants may take.

76.   **Superiority (Fed. R. Civ. P. 23(b)(3))**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the United States Class and California Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management

difficulties, conserves the resources of the parties and the court system, and protects the rights of each member of the Classes. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION
### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*

77.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

78.     Plaintiff brings this claim individually and on behalf of the members of the proposed United States Class against Defendants.

79.     Defendants are "video tape service provider[s]" because they are a cinema chain where consumers can purchase movie tickets to view movies at USA Cinema's theater locations across the country, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). In particular, by allowing consumers to purchase a ticket to a movie, Defendants are "rent[ing]" consumers access to view "prerecorded… audio visual materials," on its physical premises and is "deliver[ing]" consumers those same prerecorded audio visual materials on its premises by playing them on a cinema screen.

80.     Plaintiff and members of the United States Class are "consumers" because they have paid for movie tickets via Defendants' website for movies shown at USA Cinema's theaters. 18 U.S.C. § 2710(a)(1).

81.     Defendants disclosed to a third party, Facebook, Plaintiff's and the United States Class members' personally identifiable information. Defendants utilized the Meta Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like his Facebook ID, along with Plaintiff's event data, like the title of the videos he viewed.

82.     Defendants knowingly disclosed Plaintiff's PII because they used that data to build audiences on Facebook and retarget them for its advertising campaigns.

83.     Plaintiff and United States Class members did not provide Defendants with any form of consent – either written or otherwise – to disclose their PII to third parties.

84.     Nor were Defendants' disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Defendants' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

85.     On behalf of himself and the United States Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II
### Violation of California Civil Code § 1799.3

86.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

87.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendants.

88.     Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales and rental services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

89.     Defendants are "person[s] providing video recording sales … services" because they sell tickets on cinepolisusa.com for consumers to access USA Cinema

movie screenings, and thereby deliver thousands of videos throughout USA Cinema theater locations.  Defendants are also "person[s] providing video recording … rental services" because they are "rent[ing]" access to view "prerecorded… audio visual materials," on USA Cinema's physical premises by selling tickets to watch movies in USA Cinema cinemas.

90.    Defendants disclosed Plaintiff's and the California Class members' personal information and/or the records of Plaintiff's and the California Class members' ticket sales information to Meta and Google.  Defendants utilized the Meta and Google Analytics Tracking Pixels to compel Plaintiff's web browser to transfer Plaintiff's personal information and Plaintiff's event data, like the title of the movie they purchased tickets for.

91.    Plaintiff and the California Class members purchased tickets to movie screenings using Defendants' website, cinepolisusa.com.

92.    Defendants willfully disclosed Plaintiff's personal information because they used that data to build audiences on Facebook and other websites to then retarget them for its advertising campaigns.

93.    Plaintiff and California Class members did not provide Defendants with any form of consent – either written or otherwise – to disclose their personal information to third parties.

94.    On behalf of himself and the California Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the California Class by requiring Defendants to comply with Cal. Civ. Code §1799.3's requirements for protecting a consumer's personal information; (iii) statutory damages of $500 for each violation of the Cal. Civ. Code §1799.3 pursuant to Cal. Civ. Code §1799.3(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendants, individually and on behalf of all others similarly situated, as follows:

(a)  For an order certifying the United States Class and California Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as a representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)  For an order declaring that Defendants' conduct violates the statutes referenced herein;

(c)  For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)  An award of statutory damages to the extent available;

(e)  For punitive damages, as warranted, in an amount to be determined at trial;

(f)  For prejudgment interest on all amounts awarded;

(g)  For injunctive relief as pleaded or as the Court may deem proper; and

(h)  For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.


Dated:  November 13, 2023        **BURSOR & FISHER, P.A**.

By:  _/s/ Stefan Bogdanovich_
Stefan Bogdanovich

L. Timothy Fisher (State Bar No. 191626)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700

E-mail: ltfisher@bursor.com
sbogdanovich@bursor.com

*Attorneys for Plaintiff*