Teresa C. Chow (237694)
*tchow@bakerlaw.com*
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA  90025-0509
Telephone:  310.820.8800
Facsimile:   310.820.8859

*Attorneys for Defendants*
CALIFORNIA CINEMA INVESTMENTS
LLC AND USA CINEMA INVESTMENTS
HOLDING INC., D/B/A CINEPOLIS
LUXURY CINEMAS and CINEPOLIS USA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| MICHAEL WALSH, individually and on behalf of all others similarly situated, | Case No.: 2:23-cv-09608-ODW-AJR |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' 12(B)(6) MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |
| v. | |
| CALIFORNIA CINEMA INVESTMENTS LLC and USA CINEMA INVESTMENTS HOLDING INC., d/b/a CINEPOLIS LUXURY CINEMAS and CINEPOLIS USA, | [*Filed Concurrently with Notice of Motion; Fed. R. Civ. P. 5.1 Notice of Constitutional Question; and [Proposed] Order*] |
| Defendants. | DATE:    April 15, 2024<br>TIME:    1:30 PM<br>CTRM:    5D |
| | Case Filed:    11/13/2023 |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................ 1

II.   BACKGROUND ................................................................................. 1

III.  STANDARD OF LAW ....................................................................... 2

IV.   ARGUMENT ..................................................................................... 2

   A.   PLAINTIFF FAILS TO STATE A CLAIM UNDER THE VPPA ................................................................................................ 2

      i.   Plaintiff Does Not Allege That Cinépolis Is A Video Tape Service Provider ..................................................................... 2

      ii.  Plaintiff Does Not Allege Cinépolis Knowingly Disclosed PII ............................................................................................ 6

         1.   Plaintiff Fails To Allege Cinépolis Discloses PII. .......... 6

            a.   The FID Is Not PII. .............................................. 6

            b.   Even If The FID Was PII, Plaintiff Alleges His Own Browser Disclosed The Information, Not Cinépolis. .......................................................... 10

         2.   Plaintiff Fails To Allege The "Knowingly" Element ................................................................................ 12

   B.   PLAINTIFF FAILS TO STATE A CLAIM UNDER CALIFORNIA CIVIL CODE § 1799.3 ..................................... 12

   C.   ALTERNATIVELY, THE VPPA AND § 1799.3 ARE FACIALLY UNCONSTITUTIONAL. ........................................ 14

      i.   The Statutes Are Unconstitutionally Vague in Violation of Due Process. ..................................................................... 14

      ii.  The Statutes Violate The First Amendment. ........................... 16

         1.   No Substantial Government Interest. ........................... 16

         2.   The Statutes' Requirements Do Not Materially Advance, And Are Far More Extensive Than Necessary To Serve, Any Government Interest. ........... 17

      iii. Alternatively, The Court Should Partially Invalidate The Statutes. ................................................................................ 19

   D.   ALTERNATIVELY, THE STATUTES, AS APPLIED, VIOLATE THE FIRST AMENDMENT. ..................................... 20

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

i

1

V.    CONCLUSION ................................................................................... 22

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
12(B)(6) MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO.:  2:23-CV-09608-ODW-AJR

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ......................................................................... 2

*Barr v. Am. Ass'n of Political Consultants, Inc.,*
   140 S. Ct. 2335 (2020) ................................................................... 19

*Bd. of Trustees of State Univ. of New York v. Fox,*
   492 U.S. 469 (1989) ....................................................................... 17

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ......................................................................... 2

*Broadrick v. Oklahoma,*
   413 U.S. 601 (1973) ................................................................. 16, 18

*Brown v. Entertainment Merchants Assoc.,*
   131 S.Ct. 2729 (2011) ................................................................... 17

*Caviness v. Horizon Cmty. Learning Ctr., Inc.,*
   590 F.3d 806 (9th Cir. 2010) .......................................................... 2

*Central Hudson Gas & Electric Corp. v. Public Service Commission of*
   *New York,*
   447 U.S. 557 (1980) ....................................................................... 16

*Connally v. General Constr. Co.,*
   269 U.S. 385 (1926) ....................................................................... 14

*Edwards v. Learfield Commc'ns, LLC,*
   No. 1:23-CV-65-AW-MAF, 2023 WL 8544765 (N.D. Fla. Oct. 6,
   2023) ........................................................................................ 7, 10

*Eichenberger v. ESPN, Inc.,*
   876 F.3d 979 (9th Cir. 2017) ...................................................... 4, 20

*Eichenberger v. ESPN, Inc.,*
   No. 14–cv–463 (TSZ), 2015 WL 7252985 (W.D. Wash. May 7,
   2015) ............................................................................................. 8

iii

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Ellis v. Cartoon Network, Inc.*,
    803 F.3d 1251 (11th Cir. 2015) ................................................................ 8

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ................................................................ 14, 15

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ................................................................ 11

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ................................................................ 19

*Ghanaat v. Numerade Labs, Inc.*,
    No. 23-CV-00833, 2023 WL 5738391 (N.D. Cal. Aug. 28, 2023) ................... 10

*In re Hulu Priv. Litig.*,
    No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ................. 8

*Katz v. United States*,
    389 U.S. 347 (1967) ................................................................ 5, 21

*In re Meta Pixel Healthcare Litig.*,
    No. 22-cv-03580, 2022 WL 17869218 (Dec. 22, 2022, N.D. Cal.
    2022) ................................................................ 11, 12

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2nd Cir. 2017) ................................................................ 18

*Moghadam v. Regents of Univ. of Cal.*,
    169 Cal.App.4th 466 (2008) ................................................................ 13

*Mount v. PulsePoint, Inc.*,
    No. 13 CIV. 6592 (NRB), 2016 WL 5080131 (S.D.N.Y. Aug. 17,
    2016) ................................................................ 11

*In re Nickelodeon Consumer Privacy Litig.*,
    827 F.3d 262 (3d Cir. 2016) ................................................................*passim*

*Osheske v. Silver Cinemas Acquisition Co.*,
    No. 222CV09463HDVJCX, 2023 WL 8188464 (C.D. Cal. Oct. 31,
    2023) ................................................................ 4, 6

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

iv

*Paris Adult Theatre I v. Slaton*,
   413 U.S. 49 (1973) ................................................................. 5, 21

*Robinson v. Disney Online*,
   152 F. Supp. 3d 176 (S.D.N.Y. 2015) ........................................ 6, 8

*Safeco Inc. Co. v. Burr*,
   551 U.S. 47 (2007) ..................................................................... 14

*Solomon v. Flipps Media, Inc.*,
   No. 22CV5508JMAJMW, 2023 WL 6390055 (E.D.N.Y. Sept. 30,
   2023) ........................................................................................ 10

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) .............................................................. 16, 17

*U.S. West, Inc. v. FCC*,
   182 F.3d 1224 (10th Cir. 1999) .................................................. 16

*United States v. Knotts*,
   460 U.S. 276 (1983) .............................................................. 21, 22

**Statutes**

18 U.S.C. § 2710(a)(3) ...................................................................... 6

18 U.S.C. § 2710(a)(4) ...................................................................... 2

18 U.S.C. § 2710(a)-(b) ................................................................... 15

18 U.S.C. § 2710(b)(1) ............................................................ 6, 8, 12

18 U.S.C. § 2710(b)(2)(B) ............................................................... 17

18 U.S.C. § 2710(b)(2)(B)(i)-(iii) .................................................... 19

38 U.S.C. § 7331 .............................................................................. 18

42 U.S.C. § 12181(7)(C) .............................................................. 5, 21

Cal. Civ. Code § 1799 ...................................................................... 13

Cal. Civ. Code § 1799.3 ................................................................ 1, 19

Cal. Civ. Code § 1799.3(a) .......................................................... 13, 15

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Cal. Civ. Code § 1799.3(c)-(d) .......................................................................... 13, 14

Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*............................................ 1

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................. 1, 2

**Other Authorities**

134 Cong. Rec. S16312-01, 1988 WL 177971 ............................................. 4, 5, 20

"Cookie" (df. 3) https://www.merriam-webster.com/dictionary/cookie................. 11

"deliver" (verb) df. 2a, at https://www.merriam-
    webster.com/dictionary/deliver ....................................................................... 3

"movie theater" df. 1, at https://www.merriam-
    webster.com/dictionary/movie-theater .............................................................. 3

"rent" (verb) df. 1, at https://www.merriam-
    webster.com/dictionary/rent ............................................................................. 3

S. Rep. 100-599 ................................................................................................... 4

S. Rep. No. 100-599 (1988)................................................................................ 20

"sell" (verb) df. 2a, at https://www.merriam-
    webster.com/dictionary/sell .............................................................................. 3

"ticket" df. 1, at https://www.merriam-webster.com/dictionary/ticket .................... 3

U.S. Const. Amendment I ................................................................................... 16

vi

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
12(B)(6) MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO.:  2:23-CV-09608-ODW-AJR

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## I.     **INTRODUCTION**

Defendants California Cinema Investments LLC and USA Cinema Investments Holding Inc. d/b/a Cinépolis Luxury Cinemas and Cinépolis USA (collectively, "Cinépolis") allegedly operates public movie theaters across the United States, and operate the website https://www.cinepolisusa.com to facilitate access to the public theaters. Plaintiff Michael Walsh ("Plaintiff") alleges he accessed Cinépolis's website and purchased a movie ticket while he was logged into his Facebook account and that Cinépolis's alleged disclosure of this purchase to third-parties, Facebook and Google Analytics, violates the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, *et seq*. and Cal. Civ. Code § 1799.3 ("§ 1799.3").

Plaintiff's Complaint should be dismissed pursuant to Rule 12(b)(6) because Plaintiff does not allege any facts to show Cinépolis is a video tape service provider ("VTSP") regulated by the VPPA or that Cinépolis disclosed Plaintiff's personally identifiable information ("PII") as defined by the VPPA, let alone that it did so knowingly. Further, the application of the VPPA to the disclosure of information that is available to the public—namely, the fact that Plaintiff viewed a movie in a public movie theater—violates the First Amendment.  For the same reasons that Plaintiff fails to plead a violation of the VPPA, Plaintiff also fails to plead a violation of § 1799.3. While phrased in slightly different language than the VPPA, Plaintiff also fails to allege essential elements, including that Defendants are "video recording sales or rental services," disclosed personal information or records, or willfully violated § 1799.3.

## II.     **BACKGROUND**

Cinépolis is a public movie theater chain which operates theaters throughout the United States and operates the website https://www.cinepolisusa.com. (Compl. ¶ 1.) Plaintiff alleges that in May 2023, he purchased a movie ticket on Cinépolis's

1   website while logged into his Facebook account on the same web browser that he
2   used to access Cinépolis's website. (Compl. ¶¶ 6, 65.) Plaintiff alleges that
3   Cinépolis: (1)  shared the name of the movie for which Plaintiff purchased a ticket
4   with Meta, along with his Facebook ID, and asserts that this information constitutes
5   PII; and (2) shared information about the movie Plaintiff attended to Google
6   Analytics, which constitutes "personal information" or "records". (Compl. ¶¶ 65-
7   67, 90.) Plaintiff alleges that Cinépolis's conduct violates the VPPA and § 1799.3
8   because Cinépolis did not receive Plaintiff's consent allowing it to disclose his PII
9   to third parties. (Compl. ¶ 81-83, 90-93.) Plaintiff seeks to assert his claims on
10  behalf of two putative classes. (Compl. ¶¶ 69-70.)

## III.   <u>STANDARD OF LAW</u>

12       To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must
13  plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*
14  *Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when
15  the plaintiff pleads factual content that allows the court to draw the reasonable
16  inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,
17  556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556).  "Conclusory
18  allegations of law and unwarranted inferences are insufficient to defeat a motion to
19  dismiss for failure to state a claim." *Caviness v. Horizon Cmty. Learning Ctr., Inc.*,
20  590 F.3d 806, 812 (9th Cir. 2010).

## IV.   <u>ARGUMENT</u>

## A.   <u>PLAINTIFF FAILS TO STATE A CLAIM UNDER THE VPPA.</u>

### i.   <u>*Plaintiff Does Not Allege That Cinépolis Is A Video Tape Service Provider.*</u>

25       The VPPA defines a "video tape service provider" as "any person, engaged
26  in the business, in or affecting interstate or foreign commerce, of rental, sale, or
27  delivery of prerecorded video cassette tapes or similar audio visual materials." 18

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

U.S.C. § 2710(a)(4). Significantly, even though public movie theaters such as those operated by Cinépolis have been ubiquitous since long before the passage of the VPPA, Congress did *not* include language in the VPPA indicating that "movie theaters" are restricted from disclosing their patrons' movie viewing history. Instead, Congress referred to a "video tape service provider" and to "video cassette tapes or similar audio visual materials"—*i.e.*, the types of *portable* materials one could obtain from a video rental store and take back to the privacy of their home for viewing. Indeed, the verbs "rent," "sell," and "deliver" are all defined to include a transfer of some possessory interest. "Rent" means "to grant the possession and enjoyment of in exchange for rent." *See* "rent" (verb) df. 1, at https://www.merriam-webster.com/dictionary/rent. "Sell" means "to give up (property) to another for something of value (such as money)." *See* "sell" (verb) df. 2a, at https://www.merriam-webster.com/dictionary/sell. "Deliver" means to "to take and hand over to or leave for another." *See* "deliver" (verb) df. 2a, at https://www.merriam-webster.com/dictionary/deliver. These statutory terms which all require the transfer of some possessory interest *in the audio visual materials* aligns with the types of *portable* media that one can rent, purchase, or have delivered to one's own home. In contrast, none of these verbs make sense in the context of a movie theater, which does not "rent," "sell" or "deliver" movies, but rather "shows" movies. *See* "movie theater" df. 1, at https://www.merriam-webster.com/dictionary/movie-theater ("a building or part of a building having seating for an audience and a large screen for showing movies"). What a movie theater sells—and what Plaintiff alleges he purchased—is a ticket, which is "a certificate or token showing that a fare or admission fee has been paid." *See* "ticket" df. 1, at https://www.merriam-webster.com/dictionary/ticket. A ticket is neither a "prerecorded video cassette tape[]" nor a "similar audio visual material[]," and does not grant a person any possessory interest *in any audio visual materials*; a ticket

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

merely grants a person a license to enter a public movie theater at a particular date and time. *See Osheske v. Silver Cinemas Acquisition Co.*, No. 222CV09463HDVJCX, 2023 WL 8188464, at *4 (C.D. Cal. Oct. 31, 2023) ("When consumers purchase a movie ticket, they are purchasing a license to enter the theater . . . ."). The plain language of the statute, therefore, does not support Plaintiff's novel theory that movie theaters are "video tape service providers" covered by the VPPA.

The legislative history supports this interpretation of the statutory text. As Plaintiff alleges in the Complaint, a group of senators crafted the VPPA in response to "a movie rental store['s]" disclosure of the "rental history" of Supreme Court nominee Judge Robert Bork, which was then published in a local newspaper. (Compl. ¶ 16 (citing S. Rep. 100-599, at 5-6).) Against this backdrop, courts analyzing the VPPA have explained that Congress's intention was to "codif[y] a context-specific extension of the substantive right to privacy." *See Eichenberger v. ESPN, Inc*., 876 F.3d 979, 983 (9th Cir. 2017) (the VPPA "protects generally a consumer's substantive privacy interest in his or his video-viewing history."). Specifically, Congress wanted to ensure that video tape service providers would not share the video viewing information of persons who chose to view videos in the privacy of their own homes. *See* S. Rep. 100-599, at 5-6 ("[I]t is nobody's business what [anyone] watch[es] on television or read[s] or think[s] about **when they are home**.") (emphasis added); *see also* 134 Cong. Rec. S16312-01, 1988 WL 177971 (Rep. Simon) ("Who would guess that the choice of movies one watches in the **privacy of the home** would not be confidential? The Video Privacy Protection Act takes an important step in ensuring that individuals will maintain control over their personal information when renting or purchasing a movie.") (emphasis added).

Nor is there any indication in the legislative history that Congress meant to regulate movie theaters through the VPPA. The legislative history of the VPPA

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

reflects it was passed to address the new technology at the time, *i.e.,* the ability to watch movies from the privacy of one's own home. *See* 134 Cong. Rec. S16312-01, 1988 WL 177971 (Rep. Grassley) ("[P]rivacy is not a generalized right. And it is up to the legislature to define and give meaning to privacy. As our society grows more complex, legislatures should be responsive to new technological threats to privacy."). Congress's decision to limit the VPPA to the types of materials a person views in their own home makes sense because it is well-settled that people have no reasonable expectation of privacy in conduct which they engage in publicly—such as attendance at a public movie theater. *See Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

Therefore, the text of the VPPA, the context in which it was passed, and the legislative history discussing the purpose of the VPPA all demonstrate the statute covers businesses which rent, sell, or deliver video media over which a person gains a permanent or temporary possessory interest such that the material can be viewed in the privacy of the person's home or other private location of their choosing. The statute is not meant to extend, and does not extend, to businesses like Cinépolis that operate *public* movie theaters—which are quintessentially places of public accommodation. *See* 42 U.S.C. § 12181(7)(C) (defining "public accommodation" to include "a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment"); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65 (1973) ("This Court has, on numerous occasions, refused to hold that commercial venues such as motion-picture house are 'private' for the purpose of civil rights litigation and civil rights statutes.").

Cinépolis is not aware of a *single* case in the VPPA's 36-year history which has applied the statute to a movie theater. To the contrary, the only case which has addressed this issue to date dismissed the VPPA claim filed against a movie theater

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

for the reasons described above. *See, e.g.*, *Osheske*, 2023 WL 8188464, at *1, 3-6 (dismissing with prejudice because "[m]ovie theaters do not rent movies, sell movies, or deliver movies; they 'show' movies."). Because public movie theaters like Cinépolis are not "video tape service providers" as defined by the VPPA, Plaintiff has failed to state a claim and the Complaint must be dismissed with prejudice.

*ii.* <u>*Plaintiff Does Not Allege Cinépolis Knowingly Disclosed PII.*</u>

Unless a VTSP has provided notice and obtained consent, it is prohibited from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015); 18 U.S.C. § 2710(b)(1). PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). "[T]he information disclosed by a video tape service provider must, at the very least, identify a *particular person*—not just an anonymous individual—and connect this particular person with his or his viewing history." *Robinson*, 152 F. Supp. 3d at 179.

### 1. Plaintiff Fails To Allege Cinépolis Discloses PII.

Plaintiff fails to allege Cinépolis discloses PII for two distinct reasons. First, the Facebook IDs ("FIDs") are not PII. Second, Plaintiff's allegations demonstrate Plaintiff's own browser sends this information, not Cinépolis.

a. The FID Is Not PII.

The most basic requirement of a VPPA claim is disclosure of "the kind of information that would ***readily permit an ordinary person*** to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 267 (3d Cir. 2016) (emphasis added) ("*Nickelodeon*"). The "disclosure" on which Plaintiff bases his claim is simply a string of numbers, *e.g.*,

6

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

"1528550551," (Compl. ¶ 36), contained within the transmission of complex computer code that Plaintiff alleges is only accessible "by accessing developer tools" (Compl. ¶ 35). This is the example of the "disclosure" Plaintiff provides in the Complaint:



(Compl. ¶ 35.) That, on its face, is not "information that would ***readily permit an ordinary person*** to identify a specific individual's video-watching behavior." *Nickelodeon*, 827 F.3d at 267 (emphasis added). *See Edwards v. Learfield Commc'ns, LLC*, No. 1:23-CV-65-AW-MAF, 2023 WL 8544765, at *8 (N.D. Fla. Oct. 6, 2023) ("Although Plaintiffs do allege that the Gators Website transmits metadata, which contains c_user IDs and 'may' contain video titles, [citation omitted], they offer no facts explaining how Facebook accesses that metadata, why doing so does not require technical expertise, or how much metadata Facebook has to comb through to discover someone's c_user ID and the video titles.").

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Even if this metadata could be deciphered by an ordinary person without technical expertise (and it cannot), Plaintiff has not alleged the FID contained within the metadata constitutes PII. To the contrary, the FID is merely a static digital identifier which is not PII. The VPPA "protects personally identifiable information that *identifies a specific person* and *ties that person to particular videos that the person watched.*" *Nickelodeon*, 827 F.3d at 285 (quoting *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *8 (N.D. Cal. Apr. 28, 2014) (emphasis added)).[1] Here, Plaintiff's Complaint demonstrates the sole information allegedly disclosed by Cinépolis is not itself identifying because the information Plaintiff alleges Cinépolis disclosed—the FIDs—are merely static digital identifiers.[2] (*See* Compl. ¶ 36.) Static digital identifiers, as defined in *Ellis v. Cartoon Network, Inc.* 803 F.3d 1251, 1257 (11th Cir. 2015), include such things as a unique device identifier that is "randomly generated when a user initially sets up his device and should remain constant for the lifetime of the user's device." *Nickelodeon*, 827 F.3d at 282, n.124 (citing *Ellis*). These random strings of numbers, when viewed by an ordinary person, do not identify who that person is. Rather, static digital identifiers "fall[] even further down the spectrum [of identifiable information]" because "[t]o an average person, an IP address or *a digital code in a <u>cookie file</u> would likely be of little help in trying to identify an actual person.*" *Nickelodeon*, 827 F.3d at 283 (emphasis added). Although some

---

[1] *See also Robinson,* 152 F. Supp. 3d at 182 ("the most natural reading of PII suggests that it is the information actually 'disclos[ed]' by a 'video tape service provider,' 18 U.S.C. § 2710(b)(1), *which must itself do the identifying* that is relevant for purposes of the VPPA (literally, 'information which identifies')—*not information disclosed by a provider, plus other pieces of information* collected elsewhere by non-defendant third parties.") (emphasis added).

[2] *Nickelodeon* noted "[m]ost [courts] have followed the rule adopted in *In re Hulu Privacy Litigation*" and "concluded that static digital identifiers that could, in theory, be combined with other information to identify a person do not count as 'personally identifiable information' under the Act, at least by themselves." 827 F.3d at 283 (collecting cases including *Robinson,* 152 F. Supp. 3d at 182–83; *Eichenberger v. ESPN, Inc.*, No. 14–cv–463 (TSZ), 2015 WL 7252985, at *4–5 (W.D. Wash. May 7, 2015); *Ellis,* 2014 WL 5023535, at *3).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   courts have since held an FID is PII because it can be plugged into a Facebook

2   URL and PII *may* be found on the resulting Facebook profile, this multi-step

3   investigative process does not make the FID, shared through the "c_user" cookie,

4   PII, as explained by the *Nickelodeon* court.

5         In *Nickelodeon*, the type of information at issue was plaintiff's IP address, a

6   user's browser and operating system settings, and *a computing device's unique*

7   *device identifier. Id*. at 281-82. The court held "the expansion of privacy laws since

8   the Video Privacy Protection Act's passage demonstrates that, whatever else

9   'personally identifiable information' meant in 1988, it did not encompass" such

10   static digital identifiers. *Id*. at 286.[3] And unlike other statutes which "gave the FTC

11   authority to expand the types of information that count as personally identifying

12   under that law," "*[t]he Video Privacy Protection Act . . . does not empower an*

13   *administrative agency to augment the definition of 'personally identifiable*

14   *information' in light of changing circumstances or new technologies*. The

15   meaning of that phrase in the Act is, it would appear, *more static.*" *Id*. (emphasis

16   added.) Further, and more importantly, *Nickelodeon* explained Congress's

17   subsequent amendment of the VPPA in 2013 demonstrates Congress "was keenly

18   aware of how technological changes have affected the original Act" and "*[d]espite*

19   *this recognition*, *Congress did not update the definition of personally identifiable*

20   *information in the statute.*" *Id*.  "What's more, it chose not to do so despite . . .

21   submitted written testimony that" specifically argued for "the addition of Internet

22

23   _____

24   [3] The court compared the VPPA to the Children's Online Privacy Protection Act
     ("COPPA"), which was amended once by FTC rules in 2000 to define personal

25   information to include "a persistent identifier, such as a customer number held in a
     cookie or a processor serial number, where such identifier is associated with

26   individually identifiable information" and a second time in 2013 to expand the
     definition to include "'*any persistent identifier that can be used to recognize a user*

27   *over time and across different Web sites or online services*,' including but not limited
     to '*a customer number held in a cookie*, an Internet Protocol (IP) address, a processor
     or device serial number, or unique device identifier.'" *Id*. at 287 (emphasis added).

28                                         9

Protocol (IP) Addresses and ***account identifiers*** to the definition of [personally identifiable information]." *Id*. at 288 (emphasis added).

This Court should follow the detailed reasoning set forth by *Nickelodeon*, and recently adopted by *Edwards*, to hold the FIDs Plaintiff alleges were disclosed are ***not*** PII because they are merely static digital identifiers automatically sent through a cookie file to a single company, which is nothing like the purposeful and public disclosures of actual names with video viewing history to the public at large. *See id.* at 286; *Edwards*, 2023 WL 8544765, at *8.[4] Indeed, "[t]he classic example will always be a video clerk leaking an individual customer's video rental history," and "every step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim." *Nickelodeon*, 827 F.3d at 286.

b. Even If The FID Was PII, Plaintiff Alleges His Own Browser Disclosed The Information, Not Cinépolis.

Plaintiff alleges Cinépolis added the Meta Pixel (the "Pixel") to its website "to track consumers' every move while on Defendants' website." (Compl. ¶ 30.) Plaintiff alleges the Pixel causes website visitors' information to be sent to Facebook through the "c_user" cookie or "fr" cookie. (Compl. ¶¶ 35-41, 43.) Plaintiff further alleges that Meta (*i.e.*, Facebook) places a cookie on his browser. (*Id.* ¶ 40) ("A third party cookie is 'created by a website with a domain name other than the one the user is currently visiting' – *i.e.*, Facebook.").) In other words, Plaintiff alleges the c_user and "fr" cookies containing the FID were placed on his computer *by Facebook* when he logged into his Facebook account, and that the

---

[4] Plaintiff does not allege that his own public Facebook profile actually contains personally identifying information. *See also Ghanaat v. Numerade Labs, Inc.*, No. 23-CV-00833, 2023 WL 5738391, at *4 (N.D. Cal. Aug. 28, 2023) ("plaintiffs' allegations are inadequate because they do not allege their Facebook pages contain any personal information, such as their names or email addresses"); *Solomon v. Flipps Media, Inc.*, No. 22CV5508JMAJMW, 2023 WL 6390055, at *3 (E.D.N.Y. Sept. 30, 2023) (same).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

c_user or "fr" cookie *on his own computer* transmit his FID to Meta when he visits a website using the Pixel. Plaintiff does ***not*** allege Cinépolis ever even possesses the FID—which is something stored in the c_user or "fr" cookie file on his own computer.

Plaintiff's allegations align with how cookies generally work. For example, *In re Facebook, Inc. Internet Tracking Litig.* explains that "[w]hen a user creates a Facebook account, more than ten Facebook cookies are placed on the user's browser. These cookies store the user's login ID [FID], and they capture, collect, and compile the referer headers from the web pages visited by the user" and "continued to capture information after a user logged out of Facebook and visited other websites." 956 F.3d 589, 596 (9th Cir. 2020); *see also In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580, 2022 WL 17869218 at *4 (Dec. 22, 2022, N.D. Cal. 2022) ("Cookies are 'small pieces of text used to store information on web browsers.'"); *Mount v. PulsePoint, Inc.*, No. 13 CIV. 6592 (NRB), 2016 WL 5080131, at *1-2 (S.D.N.Y. Aug. 17, 2016) ("Persistent cookies, commonly called 'tracking cookies,' are designed to remain after the user moves on to a different website or even after the browser is closed. Persistent cookies are set by third parties, including advertising companies that have placed ads on the first-party website."). The dictionary defines "cookie" as "a small file or part of a file ***stored on a World Wide Web user's computer***, created and subsequently read by a website server, and containing personal information (such as a user identification code, customized preferences, or a record of pages visited)." *See* "Cookie" (df. 3) https://www.merriam-webster.com/dictionary/cookie (emphasis added).

Plaintiff's own allegations, the dictionary definition of "cookie," and case law on third-party Facebook cookies make clear Plaintiff's FID is stored ***on Plaintiff's computer***—not by Cinépolis—and subsequently transmitted to Facebook and Meta ***by Plaintiff's own browser***. Therefore, even if this Court were

11

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

to find that FIDs are PII (which they are not), Cinépolis is not the one that transmits the FID to Meta. The VPPA only applies to an entity that "discloses" PII, 18 U.S.C. § 2710(b)(1), and Cinépolis cannot possibly "disclose" something it never possesses in the first place.

Plaintiff fails to allege Cinépolis discloses any other PII, such as his name, to Meta. Rather, his claims rely solely on the alleged transmission of his FID to Meta which is transmitted by Plaintiff's own browser ***because Plaintiff has given Facebook consent to collect such information***. (Compl. ¶¶ 27, 29); *see In re Meta Pixel Healthcare Litig*., 2022 WL 17869218 at *5 ("Meta gives users the ability to control the use of information about their off-Facebook activity"; "Users can 'disconnect' the off-Facebook activity that has been associated with their account—which prevents the data from being used for personalized advertising"). Because Plaintiff's specific allegations support that Plaintiff's FID is transmitted by his own browser—not by Cinépolis—and because he does not allege Cinépolis discloses any other PII to Facebook, Plaintiff fails to allege Cinépolis discloses PII.

### 2. Plaintiff Fails To Allege The "Knowingly" Element.

Beyond Plaintiff's failure to allege Cinépolis disclosed PII at all, he also does not allege Cinépolis had any way to know whether he, or any other user, had an FID, much less what those FIDs were, or whether Plaintiff set his browser to allow Facebook cookies. Therefore, the Complaint does not and cannot plausibly assert that Cinépolis *knowingly* disclosed his FID, let alone his PII, to Facebook.

### B. PLAINTIFF FAILS TO STATE A CLAIM UNDER CALIFORNIA CIVIL CODE § 1799.3.

Section 1799.3 provides that "[n]o person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record,

without the written consent of that individual." Cal. Civ. Code § 1799.3(a). Only "willful" violations can result in civil penalties. *Id*. § 1799.3(c). Plaintiff's Section 1799.3 claims must be dismissed for essentially the same reasons described above.

**First**, Cinépolis is not a "video recording sales or rental service" because the statute does not refer to "movie theaters," and movie theaters like Cinépolis do not "sell" or "rent" video recordings.[5] *Supra* Section IV(A)(i).

**Second**, Cinépolis does not "disclose" any information, much less any information "which is prepared or maintained by" Cinépolis, because the information all comes from the user's browser as the user navigates the website, and Cinépolis never even possesses the information at issue. *Supra* Section IV(A)(ii)(1)(b). Moreover, California courts have construed the term "maintained" in a similar statute to apply "only to institutional records that are preserved in the ordinary course of business by a single, central custodian." *See Moghadam v. Regents of Univ. of Cal.*, 169 Cal.App.4th 466, 480 (2008). Information which is instantaneously transmitted directly from a user's browser to a third party as a user navigates a website cannot possibly be "prepared or maintained" by Cinépolis.

**Third**, the information allegedly transmitted does not constitute "personal information" because it would not readily permit an ordinary person to identify a specific individual. *Supra* Section IV(A)(ii)(1)(a). Moreover, California courts have rejected the idea that a person's name alone can constitute "personal information" when it is not connected to some other identifying data such as a social security number—and here, the FID allegedly transmitted amounts to even less than a person's name. *See Moghadam*, 169 Cal.App.4th at 484. Similarly, "record" is defined as "any item, collection, or grouping of information ***about an individual*** or business entity." Cal. Civ. Code § 1799 (emphasis added). Plaintiff alleges Meta and Google Analytics capture the name of the movie, ticket price, quantity, type of

---

[5] Section 1799.3 does not refer to "delivery."

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

ticket, theater location, and total price paid with tax. (Compl. ¶¶ 48-49.) Plaintiff's Complaint is devoid of any allegation regarding how this information is "about an individual," and as discussed, an FID is not PII. As demonstrated by Plaintiff's figures, there is no information *about an individual* transmitted. (Compl. ¶ 49, Figs. 13-14.) Google Analytics or Meta receive general information about an unknown person's movie ticket purchase. (*Id.*). This transmission is devoid of identifiable information.

*Fourth*, Plaintiff conflates willful disclosure with willful violation of § 1799.3: "Defendants willfully disclosed Plaintiff's personal information . . . ." (Compl. ¶ 92.) Section § 1799.3 requires a willful *violation*, and Plaintiff fails to allege Cinépolis willfully violated § 1799.3. *See* Cal. Civ. Code § 1799.3(c)-(d). A violation is not willful where the defendant's interpretation of the statute is not "objectively unreasonable." *See Safeco Inc. Co. v. Burr*, 551 U.S. 47, 69-70 (2007). For all the reasons discussed above, there are numerous reasonable bases to conclude that Cinépolis and the conduct at issue in this case are not covered by the statute—and at a minimum, construing the statute as Cinépolis proposes is not objectively unreasonable.

## C.     ALTERNATIVELY, THE VPPA AND § 1799.3 ARE FACIALLY UNCONSTITUTIONAL.

### i.     *The Statutes Are Unconstitutionally Vague in Violation of Due Process.*

If the VPPA and § 1799.3 are interpreted in the manner that Plaintiffs advocate, then they are unconstitutionally vague in violation of the Due Process Clause of the Fifth and Fourteenth Amendments. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *Connally v. General Constr. Co.*, 269 U.S. 385, 391

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

(1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law").) Due Process "requires the invalidation of laws that are impermissibly vague," and "the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

The recent explosion of VPPA litigation[6] is due to the VPPA's vague restriction on "any person*,* engaged in the business . . . of rental, sale or *delivery* of prerecorded video cassette tapes or *similar audio visual materials*" from knowingly disclosing "to any person, *personally identifiable information* concerning any consumer of such provider." 18 U.S.C. § 2710(a)-(b) (emphasis added). Section 1799.3's references to "personal information" and "any record" are likewise vague. Cal. Civ. Code § 1799.3(a). Plaintiffs in cases such as this one are advocating for the statutes to apply to a broad range of entities that had no notice that the statutes even applied to them or to the conduct at issue in this case. Entities are being arbitrarily and discriminatorily subjected to class action lawsuits and potentially could face multi-million-dollar statutory damages and reputational injury based on their otherwise legal marketing practices. *See F.C.C.*, 567 U.S. at 255 ("reputational injury provides further reason for granting relief" where sanctions records were public and could have adverse impact on defendant's reputation that audiences

---

[6] Indeed, since 2022 alone, more than 100 complaints alleging violations of the VPPA have been filed against defendants from all sectors and industries, which simply provide videos on their websites, including Hallmark Cards, NBCUniversal Media (owner of Today.com), Intuit, Gannett Company (largest newspaper publisher in the U.S.), Weight Watchers, The Philadelphia Inquirer, the National Football League (d/b/a the NFL), Major League Baseball Advanced Media L.P., Equifax, and La-Z-Boy.

1   would likely consider). If the statutes are interpreted in the manner that Plaintiffs

2   are advocating, they are unconstitutionally vague in violation of Due Process.

3                    ii.      *The Statutes Violate The First Amendment.*

4        The First Amendment states, "Congress shall make no law … abridging the

5   freedom of speech." U.S. Const. amend. I. Restrictions on access to information in

6   private hands, such as customer data, violate the First Amendment. *See Sorrell v.*

7   *IMS Health Inc.*, 564 U.S. 552, 577 (2011) (statute purporting to restrict pharmacies

8   from selling retained information about drug prescribing habits of doctors to

9   pharmaceutical companies for marketing purposes violated First Amendment); *U.S.*

10  *West, Inc. v. FCC*, 182 F.3d 1224, 1224 (10th Cir. 1999)  (FCC regulation violated

11  First Amendment where it restricted telecommunication carriers from using

12  customer information "that is made available to the carrier by the customer solely

13  by virtue of the carrier-customer relationship" because it made speech more

14  difficult by limiting ability of carriers to target speech to particular audience).

15       Like the information at issue in *IMS Health* and *U.S. West*, the information at

16  issue in this case is commercial speech. As such, any restriction on that speech must

17  meet three conditions: (1) the government must have a "substantial interest in

18  regulating the speech," (2) the regulation must "directly and materially advance[]

19  that interest," and (3) the regulation must be "no more extensive than necessary to

20  serve the interest." *Central Hudson Gas & Electric Corp. v. Public Service*

21  *Commission of New York*, 447 U.S. 557, 566 (1980). Additionally, the VPPA's

22  "language may not be unconstitutionally vague or its prohibitions too broad in their

23  sweep, failing to distinguish between conduct that may be proscribed and conduct

24  that must be permitted." *Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973). The

25  statutes do not meet any of these conditions.

26                    **1.      No Substantial Government Interest.**

27

28
                                        16

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

The government has no "substantial interest" in restricting disclosure of information concerning video viewing. As the Supreme Court explained, "without persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription, a legislature may not revise the judgment [of] the American people, embodied in the First Amendment, that the benefits of its restrictions on the Government outweigh the costs." *Brown v. Entertainment Merchants Assoc.*, 131 S.Ct. 2729, 2734 (2011). There is no "persuasive evidence" that restrictions on video viewing information are "part of a long tradition of proscription." *Id.* To the contrary, the history of movies began with movie-goers attending movie showings in public theaters.

### 2. The Statutes' Requirements Do Not Materially Advance, And Are Far More Extensive Than Necessary To Serve, Any Government Interest.

Even if the government does have a "substantial" interest, "[t]here must be a 'fit between the legislature's ends and the means chosen to accomplish those ends.'" *IMS Health*, 564 U.S. at 572 (quoting *Bd. of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 480 (1989)). "These standards ensure … that the State's interests are proportional to the resulting burdens placed on speech…" *Id.*

The consent requirements in § 2710(b)(2)(B)(i)-(iii)[7] fail these standards. The very existence of § 2710(b)(2)(B) confirms any purported privacy interest is not limitless, but rather ends once "informed, written consent" is obtained. Congress could have, and should have, stopped there: the phrasing "informed, written consent

---

[7] Section 2710(b)(2)(B) requires "informed, written consent (including through an electronic means using the Internet) of the consumer that – (i) is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; (ii) at the election of the consumer that—(I) is given at the time the disclosure is sought; or (II) is given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, which is sooner; and (III) the video tape service provider has provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(b)(2)(B).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

… *that* …" implicitly acknowledges informed consent can be obtained in many ways, rather than requiring the elements in subsections (i)-(iii). 18 U.S.C. § 2710(b)(2)(B) (emphasis added.) Indeed, elsewhere in the federal code, "implied consent" stands on its own as a principle subject to rulemaking, *see, e.g.*, 38 U.S.C. § 7331, underscoring the lack of a single definition.

But the VPPA does not stop at informed consent. Instead, § 2710(b)(2)(B)(i)-(iii) creates onerous and arbitrary specifications that do not materially advance the purported government interests and go far beyond the prevailing understanding of enforceability of online Terms and Conditions or Privacy Policies. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2nd Cir. 2017) (explaining "clickwrap" agreements are "routinely" enforced). The ample case law regarding enforceability of website terms does not prioritize "distinct and separate" consent, temporal limitations on consent, or providing opportunity for withdrawal (*see id.*), because the incremental benefits to consumers of such procedural obligations are minimal. Indeed, subsections (i)-(iii) provide users with no additional information necessary to make an informed decision regarding having personal usage information shared with third parties; they only create materially burdensome—and free speech-chilling—compliance requirements.

A statute is overbroad and, "[l]itigants are permitted to challenge a statute . . . because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612.  The number and breadth of VPPA claims brought against companies from all industries, described *supra* n.6, proves the language of the VPPA "fail[s] to distinguish between conduct that may be proscribed and conduct that must be permitted" and likely "cause[s] others not before the court to refrain from constitutionally protected speech." *Broadrick,* 413 U.S. at 612. This is because, based on a definition of "video tape service provider"

18

as a "business" that "rents, sells, or delivers" audio visual materials, persons in any and all sectors, including restaurants, greeting card companies, and retail stores, may refrain from otherwise legal speech due to fear that they will fall under the VPPA's purview, simply because they operate a website that contains video content.

With respect to § 1799.3, the statute broadly prohibits disclosure of "personal information *or the contents of any record*," without regard to whether the personal information or record is of a private nature. This does not advance any privacy interest at all—and at a minimum is far more extensive than necessary—because, if interpreted as Plaintiff is advocating, it broadly restricts covered entities from disclosing *any* information about their customers without first obtaining consent.

iii.    <u>Alternatively, The Court Should Partially Invalidate The Statutes.</u>

Pursuant to the Court's power to partially invalidate an unconstitutional provision of a statute, the Court should invalidate the portion of the VPPA that requires additional onerous steps past simple informed consent, including but not limited to 18 U.S.C. § 2710(b)(2)(B)(i)-(iii). *See Free Enterprise Fund v. Public Company Accounting Oversight Bd*., 561 U.S. 477, 508 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact."); *Barr v. Am. Ass'n of Political Consultants, Inc*., 140 S. Ct. 2335, 2348–56 (2020) (severing unconstitutional provision rather than invalidating entire consumer privacy law).

The requirements of Section 2710(b)(2)(B)(i)-(iii) require far more than is necessary to protect the government's interest in protecting consumer's privacy. There is nothing to suggest that providing consent to Facebook for Facebook to collect website browsing activity, does not provide the user with the information

19

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    necessary to make an informed decision as to whether the user agrees to have his or

2    his personal usage information on other websites shared with Facebook. Section

3    2710(b)(2)(B)(i)-(iii) should therefore be invalidated and video tape service

4    providers should be allowed to provide notice to consumers and receive informed

5    consent through other means.

6         Section 1799.3's reference to "or the contents of any record" should likewise

7    be invalidated since it is not limited to information of a private nature.

8         **D.    ALTERNATIVELY, THE STATUTES, AS APPLIED, VIOLATE**

9              **THE FIRST AMENDMENT.**

10        The statutes, if interpreted to apply to Cinépolis, violate Cinépolis's Due

11   Process rights. For all the reasons explained in section I(A)(i) above, Cinépolis did

12   not have notice that the statutes would be construed to apply to a public movie

13   theater. Public movie theaters are not mentioned in the statutes; do not "rent,"

14   "sell," or "deliver" movies under any ordinary usage of those terms; and have a

15   business model that focuses on showing movies in public, which is fundamentally

16   different than the business model of a "video tape service provider" that rents, sells,

17   or delivers audiovisual materials to persons that are intended to be watched in the

18   privacy of those persons' homes. *See supra* Section I(A)(i).

19        Interpreting the statutes to apply to Cinépolis likewise would violate the First

20   Amendment because in this instance, Cinépolis is prohibited from sharing the same

21   information that is exposed to the public, *where no reasonable expectation of*

22   *privacy exists*—namely, information concerning movies to be viewed at a public

23   theater. The VPPA "codifies a context-specific extension of the substantive right to

24   privacy . . . [I]t protects generally a consumer's substantive privacy interest in his or

25   his video-viewing history." *See Eichenberger v. ESPN, Inc*., 876 F.3d 979, 983 (9th

26   Cir. 2017). Indeed, as explained by Senator Patrick Leahy upon introduction of the

27   VPPA, "it is nobody's business what [anyone] watch[es] on television or read[s] or

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

28

20

think[s] about *when they are home*." S. Rep. No. 100-599, at 5-6 (1988) (emphasis added); *see also* 134 Cong. Rec. S16312-01, 1988 WL 177971 (Rep. Simon) ("Who would guess that the choice of movies one watches in the *privacy of the home* would not be confidential? The Video Privacy Protection Act takes an important step in ensuring that individuals will maintain control over their personal information when renting or purchasing a movie.") (emphasis added).

But here, Plaintiff alleges he purchased a ticket to see a movie playing *in a public theater*. (Compl. ¶ 48.) A movie theater is a quintessential place of public accommodation. *See* 42 U.S.C. § 12181(7)(C) (defining "public accommodation" to include "a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment"); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65 (1973) ("This Court has, on numerous occasions, refused to hold that commercial venues such as motion-picture house are 'private' for the purpose of civil rights litigation and civil rights statutes."). Therefore, by watching a movie that he bought a ticket for, *in a public movie theater*, Plaintiff exposed the same information *to the public at large* as Cinépolis allegedly did when it allegedly sent Plaintiff's ticket purchase information to Meta. This conduct cannot be prohibited by the statutes because Plaintiff has no reasonable expectation of privacy in the information that he willfully exposes to the public. *See Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

Indeed, whether a person has a reasonable expectation of privacy is a two-fold inquiry. The first inquiry is "whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,'" or in other words whether "'he seeks to preserve [something] as private.'" *United States v. Knotts*, 460 U.S. 276, 280–81 (1983) (citing *Katz*, 389 U.S. at 361.) The second inquiry is "whether the individual's subjective expectation of privacy is 'one that society is prepared to

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
12(B)(6) MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO.:  2:23-CV-09608-ODW-AJR

recognize as 'reasonable,'" or in other words, whether "the individual's expectation, viewed objectively, is 'justifiable' under the circumstances." *Id*. (citing *Katz*, 389 U.S. at 361.)

Plaintiff cannot meet either prong of the test established in *Katz*. By choosing to purchase a ticket to attend a movie ***in public***, as opposed to purchasing or renting a movie to view in the privacy of Plaintiff's home, Plaintiff has shown his subjective intent not to preserve any purported privacy interest in the movies he chooses to view. Moreover, even if Plaintiff had a subjective expectation of privacy in his viewing of a movie in public (which he did not), this is not an expectation that society is prepared to recognize as reasonable or justifiable under the circumstances. *See Knotts*, 460 U.S. at 281-82 ("A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. When defendant travelled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property.") Just as in *Knotts*, where defendant's actions in public were not subject to a reasonable expectation of privacy, Plaintiff's action of purchasing a ticket to view a movie in a public theater is also not subject to a reasonable expectation of privacy. The statutes as applied to Cinépolis, violate the First Amendment by restricting speech that is not otherwise protected by another constitutional right.

This Court, therefore, should find the statutes, as applied to Cinépolis, are unconstitutional.

## V.    <u>CONCLUSION</u>

Cinépolis respectfully requests that this Court dismiss Plaintiff's Complaint with prejudice.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Respectfully submitted,

Dated:  January 29, 2024          **BAKER & HOSTETLER LLP**


By:   */s/ Teresa C. Chow*
          TERESA C. CHOW

*Attorneys for Defendants*
CALIFORNIA CINEMA INVESTMENTS
LLC AND USA CINEMA INVESTMENTS
HOLDING INC., D/B/A CINEPOLIS
LUXURY CINEMAS and CINEPOLIS USA


## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants California Cinema Investments LLC and USA Cinema Investments Holding Inc., d/b/a Cinépolis Luxury Cinemas and Cinépolis USA certifies that this brief contains 6,995 words, which complies with the word limit of L.R. 11-6.1.


Dated: January 29, 2024                    */s/ Teresa C. Chow*
                                                          TERESA C. CHOW

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
12(B)(6) MOTION TO DISMISS PLAINTIFF'S COMPLAINT
CASE NO.:  2:23-CV-09608-ODW-AJR